UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:10 CR 150 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| JAMES HAZELWOOD, *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

Pending before the court is Defendant Terence Sasaki's ("Sasaki") Motion to Suppress statements obtained in violation of his Fifth Amendment rights. (ECF No. 349.)  The court held an evidentiary hearing regarding Sasaki's Motion on October 4, 2011. For the reasons set forth below, Sasaki's Motion to Suppress is denied.

## I.  FACTUAL BACKGROUND

Rick Springer ("Springer"), a Diversion Investigator and Group Supervisor in the New York Drug Enforcement Administration ("DEA") office, testified that Sasaki, a doctor, contacted a Florida office of the DEA to discuss his involvement with Internet pharmacies.  (Tr. at 6-7, 12-14, 61, ECF No. 429.)  Sasaki lived in New York and expressed an interest in meeting with the DEA there.  (*Id.* at 12.) He was given the contact information for Springer and called him to set up a meeting.  (*Id.* at 6-7, 12-14, 61.)

Sasaki's meeting with the DEA took place in its New York office on June 27, 2007.  (*Id.* at 12, 16.) He arrived at the DEA's offices on his own.  (*Id.* at 17.)   He met with two Diversion

Investigators and two Special Agents.  (*Id*. at 19.)  Interviews are typically conducted with two Diversion Investigators, but Sasaki's interview also included two Special Agents who were in training at the time.  (*Id*. at 20.)  Springer did not participate in the interview.  (*Id*. at 21.)  The interview was conducted in interview rooms located in the lobby.  (*Id*.)

Springer was one of two witnesses who testified for the Government at the suppression hearing.  He was told by the Group Supervisor of the Florida DEA office, Tom Flannery ("Flannery"), that there was a doctor involved in an Internet scheme that wanted to come in and speak to the DEA about it.  (*Id*. at 12.)  Flannery told Springer that he was aware of a case that the DEA Cleveland office had "which had involved the websites and the whole organization that this doctor was involved with." (*Id*. at 12.)  Based on what Flannery related to him, Springer thought Sasaki was someone "who had crossed over the line and was involved in something which he felt was probably not legal, and that he wanted to come in and in our terms he wanted to clean himself up a little and tell us what he knew." (*Id*. at 14.)  Springer testified that it was not unusual for doctors to come into DEA to speak to investigators.  (*Id*. at 18.)

Springer cannot recall whether Sasaki specifically asked him questions about an attorney, but his standard answer when asked by targets of investigations or witnesses is that if the person feels that he needs a lawyer, he should get one, but he cannot tell him whether an attorney is needed. (*Id*. at 14-15.)  Springer does not recall Sasaki raising any issues regarding the recording his conversations with the DEA, but testified that the policy of the DEA in the New York office is not to record interviews and not to allow interviewees to record the interviews. (*Id*. at 16.)  Springer also testified that he would not have told Sasaki that any statements he made would be "off the record" since "you can't talk to the police off the record." (*Id*. at 15.)

-2-

Springer maintains that he did not make any promises to Sasaki that his statements would not be used by law enforcement or not be used against him.  Springer stated that his standard response when asked by defendants or targets about the issue of immunity is to tell them that the DEA cannot promise them anything regarding immunity because they are not authorized to provide immunity and would have to run it by the U.S. Attorney's Office first.  (*Id*. at 11.)  Springer testified that in order for a person to be considered as a potential informant, he/she must first "come forward and be truthful and tell everything that he or she knows about a particular criminal investigation." (*Id*. at 9.)

Special Agent Tyler Parkison ("S.A. Parkison"), of the Detroit office of the DEA, also testified at the suppression hearing and participated in Sasaki's interview.  (*Id*. at 52, 63-64.) S.A. Parkison was a Diversion Investigator in the Cleveland office of the DEA at the time of Sasaki's interview.  (*Id*. at 53, 60.)  S.A. Parkison stated that it was not unusual for people to come in and give voluntary interviews, and that he has conducted such interviews in the past.  (*Id*. at 75.)  S.A. Parkison testified that there were no promises made to Sasaki to get him to participate in the interview.  (*Id*.)

S.A. Parkison maintains that neither he nor the other Diversion Investigator had a firearm that day, and he did not observe the Special Agents with firearms either.  (*Id*. at 72.)  No firearms were brandished at any time during the interview.  (*Id*.)

S.A. Parkison stated that he did not recall any discussion during the meeting regarding Sasaki having a lawyer present for the meeting.  (*Id*. at 93.)  S.A. Parkison testified that there was no time that he or anyone else in the room during the interview told Sasaki that his conversations would be

off the record. (*Id.* at 69.) Further, S.A. Parkison stated that the DEA does not get involved in conversations with people that are off the record. (*Id.*)

S.A. Parkison testified that Sasaki controlled the interview because he was providing the information. (*Id.* at 71.) Only a few questions were asked of Sasaki, mostly just to clarify the information he provided. (*Id.* at 65.) However, Sasaki did not answer all the questions that were asked of him. (*Id.* at 65-66.) He refused to tell them the name of his business or provide them additional details on certain topics. (*Id.*)

During the interview, Sasaki indicated that he was interested in becoming a confidential source. (*Id.* at 67.) S.A. Parkison told Sasaki that after he provided information to them, the agents interviewing him would decide whether the DEA would be interested in using him as a confidential source. (*Id.* at 68.) However, S.A. Parkison did not make any promises during the meeting that Sasaki would become a confidential source. (*Id.*) S.A. Parkison testified that he was incapable of making any promises that Sasaki would become a confidential source because he is "not the governing individual who determines if somebody can become a confidential source." (*Id.*) S.A. Parkison stated that he needed consent from a Group Supervisor, Assistant Special Agent in Charge, and a field agent. (*Id.* at 57.) S.A. Parkison testified that in order to become a confidential informant there would first be a fairly in-depth interview to determine what criminal activities he/she is aware of. (*Id.*) Then, if the relevant DEA official determined, based on the information received, that the person under consideration would be chosen as an informant, a confidential source agreement would be signed which explains what the person could and could not do. (*Id.*) There would also be a background check, and photos and fingerprints would be taken. (*Id.*) If an individual was granted informant status, he would not be given immunity from prosecution for

criminal conduct.  (*Id*. at 58.)  Typically, informants are charged with crimes they previously committed.  (*Id*. at 60.)

S.A. Parkison testified that he did not recall Sasaki bringing up the word "immunity" at all during the meeting.  (*Id*. at 68.)  However, if Sasaki had requested immunity, S.A. Parkison testified that he would have told him that he cannot grant him immunity.  (*Id*. at 68-69.)  All he could do was take the information that was provided and make the U.S. Attorney's Office aware of it.  (*Id*. at 69.)

As the interview proceeded, S.A. Parkison felt that Sasaki was getting more relaxed and was providing some information, but not all of it.  (*Id*. at 70.)  He believed Sasaki was not being entirely truthful because he was involved in criminal activity and did not want to provide all of the relevant information regarding that at one time.  (*Id*.)  S.A. Parkison testified that typically, someone who is not completely truthful is not the type of person the DEA would want as a confidential source. (*Id*. at 73-74.)

S.A. Parkison stated that he told Sasaki, in response to his questions about some of his activities, that the DEA's position was that distributing controlled substances over the Internet, without a face-to-face relationship with the doctor, was illegal.  (*Id*. at 97.)  S.A. Parkison testified that he told Sasaki that he could not tell him what he could and could not do, but that was the DEA's position.  (*Id*.)

S.A. Parkison stated that the interview lasted approximately two hours.  (*Id*. at 70.)  The interview ended when Sasaki provided the last of the information he was willing to provide.  (*Id*. at 73.)

S.A. Parkison testified that before Sasaki contacted the DEA Florida office, they had information tying him to their investigation, making him a potential target, but the DEA was still

-5-

looking for information about him.  (*Id*. at 80, 83.)  He also testified that at that time, no information had been presented to a grand jury regarding Sasaki or their investigation into the dispensing of drugs over the Internet without a face-to-face meeting.  (*Id*. at 81-82.)  S.A. Parkison stated that Sasaki was not informed that he was a target of the investigation during the interview.  (*Id*. at 83.) S.A. Parkison testified that, although the U.S. Attorney's Office later sent Sasaki a letter informing him that he was target in a criminal investigation, "what the DEA thinks is a target and what the U.S. Attorney's Office thinks is a target is not necessarily the same thing."  (*Id*. at 80, 108.)

S.A. Parkison stated that, although he had viewed several of the e-mails where Sasaki indicated he was contacting the DEA about his status as an informant, the DEA never told him that he was not going to be a confidential informant.  (*Id*. at 89.)  S.A. Parkison testified that "in our conversations with Dr. Sasaki, we said that we would look into it."  (*Id*.)  He further indicated that at that time, they were still working with the U.S. Attorney's Office to determine whether or not they were going to use Sasaki as an informant.  (*Id*. at 106.)

## II.  LAW AND ANALYSIS

Sasaki argues that his Fifth Amendment rights were violated because he was induced to waive those rights when the DEA told him he would not need an attorney in exchange for protection as a "confidential informant." (Sasaki Mot. at 2, 7, ECF No. 349.)  Therefore, he argues, "because the implied promises of non-prosecution induced Dr. Sasaki to forfeit his Fifth Amendment rights, [ ] his statements [were] coerced and involuntary."  (*Id*. at 2.-3.)  Sasaki contends that his statements were also involuntary because of assurances that his statements would be "off the record."  (*Id*. at 4, 10, 12.)  Sasaki asserts that he was lured into sending an email to Flannery and meeting with the DEA, because the DEA gave him the impression that it was going to recommend that he be used as

-6-

a confidential informant. (*Id.* at 10.) In addition, Sasaki argues that he has suffered a violation of due process under the Fifth Amendment because the DEA failed to fulfill its promise regarding his informant status and failed to disclose to him that he was a target in a criminal investigation. (*Id.* at 14; Supplement at 2-3, ECF No. 433.)

The Government argues that Sasaki's statements were voluntary. He contacted the DEA and spoke with its agents through phone calls and e-mails, as well as at the meeting in New York. The Government contends that Sasaki was never under arrest or in custody, and suffered no physical punishments, such as deprivation of sleep or food while he was questioned. The Government asserts that "implied promises" were not the motivating factor in Sasaki seeking the DEA out and engaging in discussions with the DEA. The Government maintains that there was no promise of confidential informant status ever made to Sasaki. It argues that Sasaki *hoped* to become a confidential informant, but was not *promised* confidential informant status. Furthermore, the DEA is not authorized to provide immunity or agreements of non-prosecution. The Government argues that given that Sasaki is well-educated, a doctor, and he indicates in his Motion that he has a basic understanding of his fundamental rights, there is nothing to suggest that his discussion with the DEA would cause him to become overborne.

### A. Fifth Amendment Rights

The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself." CONST. AMEND. V. The Sixth Circuit has stated that "[w]hen a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). In order to find a confession was involuntary due to coercion by

law enforcement, three requirements must be met: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id*. The Sixth Circuit has stated that in determining whether or not a statement was elicited through unconstitutional means, the court should look at the totality of circumstances "concerning whether a defendant's will was overborne in a particular case." *Id*. (internal citation and quotation omitted). Relevant factors in making this determination include "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id*. at 423.

The Due Process Clause of the Fifth Amendment states that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." CONST. AMEND. V. The Sixth Circuit has stated that "[w]hether a person's due process rights were violated in the course of taking his statement hinges on the voluntariness of the statement." *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009). Therefore, both of Sasaki's claims, regarding the violation of his Fifth Amendment rights, from the implied promise of non-prosecution and the failure to fulfill that promise, hinge on the voluntariness of his statements.

### B. Analysis

Upon review of the totality of the circumstances in the within case, the court finds Sasaki's statements were voluntary. The police activity was not objectively coercive and Sasaki's will was not overborne. Sasaki sought the DEA out, and requested a meeting. He arrived at the meeting on his own; the DEA did not bring him to its office. He was not placed under arrest or threatened with

arrest.  There were no visible weapons on any of the agents or investigators, or brandished by any of them.  Sasaki controlled the interview; he determined how much information he was willing to provide.  He did not provide all of the information he possessed at the time.  No promises were made to Sasaki to induce him to contact the DEA or attend the meeting.  Although Sasaki did raise the issue of becoming a confidential informant and that was *his* goal in setting up the meeting, he was never actually promised informant status, nor was there ever any agreement granting him informant status.  No threats were made to force him to cooperate or make statements.  He was not deprived of food or sleep in order to force him to make statements.  He was not told that his conversations would be off the record, nor whether or not he should have an attorney.  Furthermore, the interview only lasted approximately two hours.  Thus, the totality of the circumstances surrounding Sasaki's interview demonstrate that there was no coercion and his will was not overborne.  Therefore, his statements were voluntary.

This result is supported by the Sixth Circuit's decision in *Mahan*.  There, Mahan alleged that an FBI agent's questioning had "coerced him into admitting his role in the crime by telling him that he could get into serious trouble for providing false information and that his story was unbelievable."  190 F.3d at 422.  The court found that "the totality of the circumstances surrounding Mahan's interview fall far short of the police coercion required to render a defendant's statement involuntary."  *Id*. The court noted that

> (i) Mahan was never placed under or threatened with arrest; (ii) Agent Walsh never brandished a handgun or handcuffs, or any other items associated with force or coercion; (iii) the interview took place in an unlocked room at Mahan's workplace, and Mahan was never told that he could not leave; (iv) the interview lasted only an hour and a half, including the time required to change rooms; and (v) Agent Walsh made no promises to induce Mahan's cooperation, nor did he make any threats of physical violence.

-9-

*Id.* at 423. The same is true of Sasaki's interview and other statements he provided to the DEA. Moreover, the circumstances surrounding Sasaki's interview provide much greater support for the voluntariness of his statements. Unlike Mahan, Sasaki sought the DEA out, and requested to speak with them. Sasaki went to the DEA New York office on his own. Furthermore, Sasaki, not the DEA, controlled the interview, and he ultimately concluded the interview. In addition, like Mahan, no promises were ever made to Sasaki to induce him to make statements.

The finding that Sasaki's statements were voluntary is also supported by several other Sixth Circuit cases. In those cases, the defendants had more compelling reasons to claim their statements were involuntary, yet the court ultimately found the statements to be voluntary. In *United States v. Gatewood*, 184 F.3d 550 (6th Cir. 1999), the court rejected the defendant's claim that his confession was involuntary where, the interrogation was "conducted during regular business hours" and lasted 3.5 hours, despite the defendant's allegation that the officers had threatened to charge him with other crimes and keep him from his wife. In *Ledbetter v. Edwards*, 35 F.3d 1062, 1069-70 (6th Cir. 1994), the court held that the petitioner's confession was voluntary, even though the officers lied to him to induce his statement, and the interrogation took place in the midnight hours. The *Ledbetter* court found that no physical punishments or threats were used against him, that he had not been denied any physical necessities, and that the interrogation was not unduly lengthy. *Id.*

In *United States v. Thomas*, No. 96-6079, 1997 WL 764495 (6th Cir.1997), the court held that the confession was voluntary where uniformed and armed officers told the defendant that it would be better if he told the truth, but did not express their view of the punishment he faced, and made no promises to the defendant. As described above, Sasaki's circumstances are markedly different, and provide even greater support for a finding that his statements were voluntary.

-10-

Furthermore, the characterization of these conversations as voluntary does not change because Sasaki was not informed that he was a potential target or a target of the DEA or the U.S. Attorney's Office at the time of the interview.  The Supreme Court has stated that "[b]ecause target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights."  *United States v. Washington*, 431 U.S. 181, 189 (1977).

Based on the totality of the circumstances, the court finds Sasaki's statements were voluntary and that he was not made any promises regarding immunity or becoming a confidential informant, and that no representations were made to him that he did not need an attorney. Thus, the Government has met its burden of proving the voluntariness of the statements by a preponderance of the evidence.  Because the court has concluded Sasaki's statements were voluntary, both of his Fifth Amendment claims must fail.  Consequently, Sasaki's Motion to Suppress is denied in its entirety.  (ECF No. 349.)

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

November 22, 2011

-11-